Case 4:05-cv-01121-GTE   Document 1   Filed 08/16/05   Page 1 of 28

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

AUG 1 6 2005

JAMES W. McCORMACK CLERK
By:_____
DEP CLERK

LARRY MORRIS, SR., on his own
behalf and as administrator of
the estate of Virginia Morris

PLAINTIFF

vs.

No. **4 - 05 - CV - 1 1 2 1 GTE**

CRAIG BARDELL, M.D., CORRECTIONAL
MEDICAL SERVICES, INC., and
CHERYL PIGG, R.N.

This case assigned to District Judge_____
and to Magistrate Judge_____

**DEFENDANTS**

## COMPLAINT

1.     This is an action for damages arising under the United States Constitution and the

laws of the State of Arkansas. Defendants violated the rights of Virginia Morris, the deceased

wife of the plaintiff, under the Eighth Amendment of the Constitution and the laws of the State

of Arkansas when knowingly and with deliberate indifference to her constitutional rights, they

denied her reasonable medical treatment for a serious medical condition, thereby causing her

extensive pain and suffering and ultimately, death. Defendants' conduct under the color of state

law proximately caused the deprivation of Ms. Morris' federally protected rights. Defendants'

willful and wanton conduct also gives rise to supplemental and pendant state claims.

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred upon the Court pursuant to 28 U.S.C. §§ 1331, 1343 and

1367. These claims arise under the Constitution and the laws of the United States, including

provisions of the Eighth and Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983. The Court has pendant and ancillary jurisdiction over Counts Three and Four.

3.    Venue is proper in the United States District Court for the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391 because Defendants' conduct hereinafter alleged occurred within this judicial district, and the claims arose in this judicial district.

## PARTIES

4.    Plaintiff Larry Morris, Sr. is a resident of Rosston, Nevada County, Arkansas, and is the duly appointed administrator of the estate of his deceased wife, Virginia Morris.

5.    Defendant Craig R. Bardell ("Dr. Bardell") was, at all relevant times, a citizen of the state of Arkansas, licensed to practice medicine in the State of Arkansas, and employed by Correctional Medical Services, Inc. as the medical director at the McPherson Unit in Newport, Arkansas. Dr. Bardell was involved individually, directly and in a supervisory capacity in the medical care and treatment being provided to inmate Virginia Morris. At all relevant times Dr. Bardell maintained an on-site office at the McPherson Unit and was scheduled to be on the premises eight hours each day.

6.    Defendant Cheryl Pigg, R.N. ("Nurse Pigg") was, at all relevant times, a resident of the State of Arkansas, licensed as a registered nurse and employed by CMS at the McPherson Unit. Nurse Pigg was involved individually, directly and in a supervisory capacity in the medical care and treatment of inmate Virginia Morris.

7.    Defendant Correctional Medical Services, Inc. ("CMS") is a for-profit corporation duly organized and existing under the laws of the State of Missouri with headquarters located at 12647 Olive Boulevard, St. Louis, Missouri 63141. At all times relevant hereto, CMS was a

2

comprehensive health care provider that contracted with the Arkansas Department of Correction to provide medical services at its state correctional facilities, including the McPherson Unit. CMS routinely violated the terms of its agreement with the State of Arkansas, and knew of, supported, adopted, approved and ratified the policy, custom, or practice of ignoring and violating the constitutional rights of patients at the McPherson Unit, including the decedent, Virginia Morris.

8. At all pertinent times mentioned herein, all of the Defendants employed by CMS were acting within the scope of their official duties and their employment, and under color of state law.

## FACTS

9. The McPherson Correctional Unit is the Arkansas Department of Correction's women's penitentiary in Newport, Arkansas. It was first opened in 1998 as a private prison and was operated by Wackenhut Corrections Corporation.

10. In July of 2001, the State of Arkansas contracted with CMS, a private for-profit health care services company, to provide medical, dental and mental health care to prisoners incarcerated by the Arkansas Department of Corrections, including the McPherson Unit. This contract has been renewed in July of 2002, 2003, and 2004.

11. Upon information and belief, it is alleged that in 2004, CMS was paid in excess of thirty five million dollars ($35,000,000) for delivery of a comprehensive medical and dental services program for the Arkansas Department of Correction and the Arkansas Department of Community Corrections. CMS received $1,741,571.40 for providing health care services for inmates at the McPherson Unit.

3

12.     The contract between CMS and the State of Arkansas states that the health services CMS provides to Arkansas inmates "shall be substantially equal in quality to that afforded the general populace of the State of Arkansas. Services shall reflect current established professional standards for the practice of medicine, dentistry and mental health activities."

13.     Upon information and belief it is alleged that CMS did not provide the required number of qualified personnel at McPherson pursuant to the contract. This is because of CMS' policy and custom of maximizing profit at the expense of necessary health care.

14.     CMS contracts to provide health services to more than 212,000 prisoners in 27 states. Nationwide, CMS has a history and a reputation of customarily cutting corners in prisoner health care to maintain high profits. At McPherson CMS had a custom and policy of training its medical personnel to be deliberately indifferent to the health needs of the prisoners they were responsible for treating.

15.     The contract between CMS and the State of Arkansas requires that CMS establish a policy and/or procedure regarding the drug testing of its employee. Upon information and belief Plaintiff alleges that CMS has never drug tested Dr. Bardell.

16.     The contract between the State of Arkansas and CMS provides that CMS is responsible for the first $5,600,000 annually paid for off-site and/or contracted services. If that amount is reached, CMS bills ADC for reimbursement, which is supposed to be paid within 30 days. The contract further provides that "to the extent that the actual expenditures of CMS for any contract year are less than the annual aggregate limit, CMS shall be entitled to retain all unexpended funds remaining up to the amount of the annual aggregate limit."

4

17.     Because of this contractual situation, CMS has developed a corporate policy of

not referring patients for necessary off-site diagnostics and treatment, simply because it will lose

money by doing so. Pursuant to its custom of maximizing profits without regard for the suffering

of its patients, CMS has encouraged its employees not to approve off-site and/or contracted

medical services for patients in every case where it is medically and reasonably necessary.

Plaintiff alleges that this despicable conduct and wanton disregard for the health of the patients it

is being paid to care for is per se unconstitutional.

18.     The United States Department of Justice conducted an investigation of the

conditions at McPherson in 2002 and 2003, while CMS was responsible for providing medical

services to McPherson inmates. The Department of Justice concluded that the constitutional

rights of the inmates confined in the McPherson Unit were violated and that inmates at

McPherson experienced deliberate indifference towards their serious medical needs. These

findings were laid out in a thirty five page letter dated November 25, 2003, and addressed to

Governor Mike Huckabee.

19.     CMS has a national reputation for providing prisoners with grossly inadequate

medical care, and despite the findings of the Department of Justice, it continues to provide

McPherson Unit prisoners with grossly inadequate access to health care. In fact, CMS did

nothing in response to the Department of Justice investigation, except to deny the allegations and

complain that the review "contains a number of inaccuracies and does not reflect fairly the

medical care being provided each day to inmates."

20.     The medical care being provided each day to inmates at McPherson has been an

abomination. Medical staff at McPherson routinely ignore requests for urgent care by prisoners

5

with dangerous and painful medical health problems, and CMS staff has been taught not to believe anything they are told by prisoners, including complaints of physical illness.

21.     CMS' medical staff fails to identify many prisoners with serious and chronic conditions, so these prisoners do not get essential monitoring and ongoing care. The treatment that CMS provides for chronic conditions, such as diabetes, hypertension, heart disease, and even cancer, falls far below well-established standards of care that are widely accepted by the medical community.

22.     On information and belief Plaintiff alleges that the McPherson Unit has a long history of inmates with drug-resistant staph infections. During all times relevant to this complaint CMS intentionally failed and refused to keep track of the number of wounds containing staph bacteria and failed and refused to alert the Department of Correction or the inmates of the seriousness of the infection problem at McPherson. Because of this appalling lack of documentation and any semblance of an infection control policy, staph became an ever-increasing problem while Virginia Morris was incarcerated at McPherson. Compounding the problem, CMS did not properly train its personnel to deal with staph infections on any level, and certainly not an epidemic level.

23.     Virginia Morris was forty seven (47) years old when she became incarcerated at the Arkansas Department of Correction McPherson Unit. She was married to the plaintiff, Larry Morris, Jr., and the mother of two grown children. She had hoped to be accepted into the Department of Correction's "boot camp" program for first time non-violent offenders, which would have shortened her time of incarceration significantly. As things turned out, her health problems took boot camp out of the question.

6

24.     Virginia Morris had a history of mild high blood pressure and was taking Norvasc (amlodipine besylate) to treat her hypertension at the time of her incarceration. Her blood pressure on the date of her incarceration, April 1, 2004, was 118/80. She had a mitral valve repair at age 25. Otherwise, her health history was unremarkable.

25.     As early as May, 3, 2004, Ms. Morris began to develop a rash on her body and asked for some hydrocortizone. Ms. Morris was first seen by Dr. Bardell on May 10, 2004. Her blood pressure was 142/110, and he prescribed that she take Clonidine .3 mg until she was able to start taking Lopressor. She was given .3 of Clonidine at 9:30 a.m on May 10, 2004. Dr. Bardell also ordered an EKG (no record in her chart) and blood work.

26.     There is no documentation explaining why Ms. Morris was taken off Novasc, which had been effectively controlling her hypertension prior to coming to McPherson.

27.     Later that same day, May 10, 2004, Ms. Morris asked for emergency medical care because of adverse affects of the new medication she had just started. This request was ignored.

28.     On May 21, 2004, Ms. Morris requested medical care concerning boils that had developed under her chin, which she reported were badly infected and very painful. This request, despite the fact that McPherson had a known problem with infections, and the fact that boils are often infected, was not responded to for at least three weeks.

29.     Ms. Morris' blood test results, which were reported to Dr. Bardell on May 22, 2004, indicated that her blood sugar level was 148. Although Ms. Morris had no known prior history of diabetes, she did have a family history of diabetes, yet nothing was done concerning this elevated blood sugar level. She was not diagnosed with diabetes, she was not treated for diabetes, and she was not offered any diabetic counseling or dietary advice.

7

30.     On June 6, 2004, Ms. Morris again requested medical care, by placing a Health Service Request Form in a designated medical box, complaining that she had a yeast infection and that the boil under her chin needed medical attention. This request also went unanswered.

31.     On June 15, 2004, Ms. Morris was seen by CMS employee Rachel, R.N.P. ("Nurse Johnson"). Nurse Johnson did not report any treatment, she just referred Ms. Morris to Dr. Bardell for the "lesion to chin." Incredibly, there is no indication in Ms. Morris' medical records that Dr. Bardell either saw or treated Ms. Morris for these boils or lesions. Although three weeks had gone by since Ms. Morris' blood sugar registered 148, and she was having diabetic complications, CMS personnel failed to perform a simple test to check her blood sugar level.

32.     On June 24, 2004, Virginia Morris finally saw Dr. Bardell in the infirmary for emergency medical treatment of boils. Even though a boil on her face was full of puss and extremely painful, and Ms. Morris asked to have it lanced and to be given some antibiotics, Dr. Bardell refused to give her any treatment. When Ms. Morris filed a grievance, a CMS employee named Black, who is not a medical care provider, told her that "Dr. Bardell told you to apply hot compresses 8 to 10 times a day. You received appropriate treatment."

33.     On July 13, 2004, Virginia Morris requested emergency medical treatment, reporting that she was in a lot of pain "from mosquito bites and possible spider bites." She indicated that they were spreading, swelling, and getting worse, and she felt she had a fever. She was seen by Nurse Pigg, who provided no treatment.

34.     Ms. Morris was seen for this emergency by Nurse Johnson on the following day. Nurse Johnson noted Ms. Morris' boils and also recorded that she suffered from numerous

8

abcesses on her abdomen and right inner thigh and buttocks. She prescribed Bactrim and ordered hot compresses for 10 days and no duty.

35.     Nurse Johnson failed to incise and drain these wounds and again failed to do any lab work.

36.     Ms. Morris was next seen by Nurse Pigg on July 17 and July 18, 2004, for a change of her dressing. Nurse Pigg also failed to incise and drain the wounds or take any cultures, and did not follow Nurse Johnson's July 14, 2004, orders. Rather, she just cleaned the wounds with peroxide/betadine and covered with a sterile dressing.

37.     On information and belief, plaintiff alleges that Dr. Bardell, who worked on the site every day, was aware of Ms. Morris' infections, yet failed to either see the patient or ensure that she received competent medical care.

38.     On August 5, 2004, Ms. Morris again filled out a Health Service Request Form and dropped it in the appropriate box. She stated that "I have some more boils I would like to have checked, before they get bad. Or out of hand." This request for medical care and treatment was received by Medical on August 6, 2004. The only known response to this request is that the care requested was inexplicably refused on August 10, 2004.

39.     By August 21, 2004, after nearly three months of increasingly significant disease symptoms, Ms. Morris was likely developing diabetic ketoacidosis and sepsis, and was in dire need of insulin. On that day as she lay in bed shivering under several layers of clothing, with a temperature of 101°, Nurse Pigg approached her and demanded that she remove her clothing. They got into an argument and Nurse Pigg documented an alleged disciplinary infraction without providing any treatment for her sick patient whatsoever.

9

40.     On August 24, 2004, Ms. Morris again requested emergency medical care, but nothing was done, even though her complaints were consistent with an advanced infection.

41.     On August 25, 2004, Nurse Johnson examined Ms. Morris and documented "boils to vagina and buttocks." Nurse Johnson misdiagnosed and treated Ms. Morris for a urinary tract infection, and did not provide any treatment for her other infections. She again failed to culture or treat the wounds. Dr. Bardell reviewed and approved this treatment.

42.     On August 29, 2004, Virginia Morris once again sought emergency medical treatment, complaining that the past two weeks of lower abdominal pain was worse.

43.     Ms. Morris was finally examined by Dr. Bardell on August 30, 2004. By this time Ms. Morris was severely constipated and septic.

44.     Dr. Bardell noted that she had no bowel sounds, had been nauseous and vomiting for 24-36 hours, her stool was hard pellets and she was tachycardic, with a heart rate of 130. His assessment was hypertension, laxative abuse, and an ileus, despite that fact that there is no evidence in any of Ms. Morris' medical records or elsewhere that she had ever "abused" laxatives.

45.     Dr. Bardell also refused to give any pain medication. He ordered that Ms. Morris be placed on NPO status, meaning no food or drink by mouth, and requested that she be sent to Newport Hospital for an "obstructional series." Ms. Morris was not provided any IV fluids during this time.

46.     Pursuant to CMS corporate policy this request was sent to Dr. John Roland Anderson at CMS. Dr. Anderson, fearing that Dr. Bardell's request could be interpreted as an expensive MRI, returned the request to Bardell for clarification of what "obstructive series"

10

meant. When Bardell informed him that he was only asking for a flat plate x-ray of the abdomen, and Dr. Anderson approved the request.

47.     Virginia Morris was transported to Newport Hospital for the x-rays that afternoon. Per Dr. Anderson's instructions, only 2 x-rays were taken of Ms. Morris' abdomen. According to radiologist Mufiz Chauhan, these x-rays showed retained fecal matter in the colon, and a mild degree of small bowel ileus.

48.     Rather than having a flat-plate x-ray, Ms. Morris should have been transported to the Newport Hospital Emergency Room where she could have been treated for diabetic ketoacidosis and sepsis. CMS was deliberately indifferent to the plight of Virginia Morris because of its policy of not spending money for outside services, even though it knew that Dr. Bardell was incompetent and should have known that Virginia Morris was dying.

49.     Back at McPherson, despite being septic and having an ileus, she was continued on NPO status without any IV fluids. Dr. Bardell even took the time to chastize this poor critically ill and severely dehydrated woman in a Progress Note at 4:30 p.m., writing that he had actually seen her drinking water from a roommate's pitcher.

50.     The Progress Notes reflect that by 6:00 a.m. on August 31, 2004, Virginia Morris had vomited twice. The emesis was green with red tinged areas and Ms. Morris had been moaning and crying all night. Her heart rate was still 126. Dr. Bardell was advised.

51.     By that evening, when Ms. Morris was seen by Nurse Pigg, her respirations had risen to 32 and her heart rate was dangerously tachycardic at 150. Ms. Morris reported to Nurse Pigg that she had been nauseated and had been vomiting. Her abdomen by this time was severely

11

distended, she was still constipated, likely dehydrated, and had symptoms of sepsis. Nonetheless, Virginia was kept on NPO status and not given any further treatment.

52.     Ms. Morris felt a little better on the morning of September 1, 2004. She had some bowel movement during the night, following a soap suds enema. Her abdomen remained grossly distended.

53.     However, by 1:30 p.m. Ms. Morris was once again in excruciating pain and asking for relief. "I'm hurting so bad, please give me something." Her heart rate was still high, at 120. Her abdomen was distended and tender to touch, and she had decreased bowel sounds.

54.     By 10:45 p.m. Ms. Morris was in obvious trouble and belonged in the hospital. Her abdomen was grossly distended, she was in pain, and had shortness of breath, her heart rate was tachycardic at 146 beats per minute, and there were no bowel sounds. Ms. Morris indicated she was unable to breathe lying down.

55.     At approximately midnight Ms. Morris was reportedly gagging. Shortly thereafter she complained of acute pain, even worse than before. The nurse on duty, Eleanor Counts, LPN, called Dr. Bardell at 12:21 a.m. on September 2, 2004, and reported Ms. Morris' condition and vital signs. Nurse Counts asked him what she could do for Ms. Morris and whether he had any further orders, and specifically whether to give the patient another enema or anything else. Dr. Bardell told the nurse not to give Ms. Morris anything.

56.     Nurse Counts then asked what she could give Ms. Morris for her pain. Dr. Bardell said to give her "nothing." He then repeated the order -- "nothing for present condition and nothing for pain." Per Dr. Bardell's orders Virginia Morris was put back on NPO status. This act of deliberate indifference on the part of Dr. Bardell sealed Virginia Morris' fate.

12

57.     Virginia Morris remained seated in a chair the entire night because of her shortness of breath. When she was checked at 5:50 a.m., her condition remained unchanged. Nurse Counts was unable to hear any bowel sounds in any quadrant. Ms. Morris' status was reported to Dr. Bardell at 7:20 a.m.

58.     At 10:40 a.m. on September 2, 2004, Dr. Bardell wrote an order for soap suds enemas at bedtime and stool softener twice a day. However, Ms. Morris remained on NPO status without any IV fluid.

59.     By 3:00 p.m., because of dehydration and sepsis, her blood pressure had begun to fall, to 100/60. She continued to complain of severe pain, her abdomen remained grossly distended, and her blood sugar was reported as being extremely high, and she had a fever.

60.     Finally acknowledging a problem with Ms. Morris' blood sugar level, Dr. Bardell wrote new orders at 3:35 p.m., for stat blood sugar testing, fasting blood sugar testing once a day, Glucotrol 20 mg and various other lab tests. Dr. Bardell did not record Ms. Morris blood sugar level, and did not provide Ms. Morris with any insulin.

61.     On the evening of September 2, 2004, Ms. Morris complained of being hot, but the LPN on duty did not even have a "temperature probe" available to take her temperature. She did note, however, that at 9:15 p.m. Ms. Morris' heart rate was 124, her abdomen continued to be grossly distended, and that her bowel sounds were nearly absent.

62.     Ms. Morris was given a soap suds enema at midnight and reported that she felt weak, like she was going to faint. The liquid from the enema returned unchanged. Her pulse was still extremely high at 136, and her respirations were 40.

63. Early in the morning of September 3, 2004, Ms. Morris' blood sugar level was measured as 570. She was not seen by the nurse practitioner until almost 9:00 a.m., and she was found to be lethargic, with sweet, fruity breath, and constricted and fixed pupils. "Coffee ground emesis" or vomit with dried blood was found in her mouth and in the trashcan. Nurse Johnson consulted with Dr. Bardell and the decision was made to transfer Virginia Morris to the Emergency Room at Newport Hospital.

64. No Discharge Report was ever prepared by CMS personnel and although the Newport Hospital is only a few miles away from McPherson, Dr. Bardell did not bother to drive over and check on his patient or consult with the physicians. This left the doctors at Newport with insufficient information to quickly and accurately diagnose and treat Ms. Morris. To the very end Dr. Bardell was deliberately indifferent to Virginia Morris' health.

65. Virginia Morris arrived at the Newport ER in grave condition at approximately 10:15 a.m. She was jaundiced, lethargic, tachycardic, severely dehydrated, and had slurred speech. Her blood sugar level was reported to be over 750. She was diagnosed with diabetic ketoacidosis, sepsis, ascites, peritonitis, and an active GI bleed. She was given two units of blood.

66. At approximately 5:30 p.m, Virginia Morris suffered a heart attack, had pulseless electrical activity, and was coded. She was revived and later transferred by helicopter to UAMS in Little Rock.

67. At UAMS it was discovered that Ms. Morris had suffered severe brain damage and had an extremely poor prognosis. On September 23, 2004, she once again went into pulse-less electrical activity and was revived ten minutes later. At this point Virginia Morris was

14

essentially in a vegetative state with no chance of recovery. On October 20, 2004, she was transferred to the Arkansas Department of Correction Diagnostic Unit in Pine Bluff, Arkansas.

68.     On October 22, 2003, Virginia Morris was discharged from the Department of Correction and sent to Parkview Rehabilitation and Healthcare Center in Little Rock, Arkansas, where she died on October 23, 2004.

69.     Virginia Morris' death was proximately caused by the above-described actions of CMS, Dr. Craig Bardell, and other CMS medical personnel at the McPherson Unit.

## COUNT ONE
(42 U.S.C. § 1983 -- Failure to Provide Medical Care and Treatment)
(Against all defendants)

70.     Paragraphs 1 through 69 of this Complaint are incorporated by reference as if fully set forth herein.

71.     Defendants' actions and pattern of conduct as set forth above violated Virginia Morris' Eighth Amendment right to be free from cruel and unusual punishment.

72.     Defendants' actions and pattern of conduct as set forth above demonstrated a deliberate indifference to Virginia Morris' serious medical needs.

73.     CMS, and its medical provider employees, including Dr. Bardell, demonstrated deliberate indifference to Virginia Morris' serious medical needs by, inter alia:

    (a)     ignoring her repeated complaints and fears;

    (b)     delaying and refusing necessary medical treatment for non-medical reasons;

15

     (c)     failing to recognize that she was diabetic and failing to treat her for diabetes;

     (d)     denying reasonable requests for treatment which exposed Virginia Morris to physical and emotional suffering and ultimately death;

     (e)     failing to properly monitor her medical condition; and

     (f)     preventing Virginia Morris from receiving recommended treatment and intentionally interfering with appropriate treatment.

74.     Defendants' actions were intentionally injurious, callous, willful and intolerable.

75.     CMS, through its procedures, customs, policies, and actions, displayed deliberate indifference to the serious medical needs of Virginia Morris in the following ways:

     a.     Hiring Dr. Bardell as Medical Director of McPherson, when it knew or should have known of his disastrous record while medical director of the State Correctional Institute at Muncy, Pennsylvania. It knew or should have known that Dr. Bardell had previously caused serious injury and death to female inmates because of his negligence and/or intentional acts. CMS also knew that Dr. Bardell had lost his license to practice medicine in Pennsylvania and plead guilty to a federal charge of Medicare fraud.

     b.     Allowing Tom Bradshaw, its administrator at McPherson, who is not a doctor and has no medical training, to make medical decisions which affect the lives and health of inmates at McPherson.

     c.     Failing to maintain adequate medical staffing levels at McPherson. As a result, Ms. Morris was not able to see qualified medical personnel when she asked for medical

16

help, which CMS knew was a violation of its own procedure manual, all community standards, and its contract with the State of Arkansas.

d.      By its practice and custom of refusing to pay for necessary outside medical care for those inmates who were likely to be discharged from prison in the near future, whereby CMS could avoid paying for care.

e.      Establishing an HMO-type organization whereby all outside medical referrals, even when approved by the Regional Medical Director, had to be approved by a utilization nurse at CMS headquarters in St. Louis. This system applied to every state in which CMS had a contract to provide prison health services.

f.      Continuing with the same shoddy practices and policies of cutting corners on the prisoners' medical health needs even after the United States Department of Justice specifically determined that CMS had violated prisoners' constitutional rights. In November of 2003 the Department of Justice specifically found that

> At McPherson, medical services fall short of constitutional standards in the following areas: emergent, chronic and acute care; intake physicals; referral and consults; and dental services. As explained below, these deficiencies primarily result from inadequate staffing, lack of proper supervision, and the failure to implement consistently the generally adequate written medical policies and protocols.

76.     As a result of the violations of her civil rights by CMS, and the negligent and intentional actions of CMS employees, Virginia Morris suffered the following injuries:

a.      She suffered tremendous physical pain and mental and emotional anguish;

b.      She lost the chance to be cured or successfully treated;

c.   She lost her life.

d.   Her estate lost future income and savings.

## COUNT TWO
(42 U.S.C. § 1983 – Failure to Train and Supervise)
(Against CMS)

77.   Paragraphs 1 through 76 of this Complaint are incorporated by reference as if fully set forth herein.

78.   Administration, management and operation of proving health care services to inmates of a prison are traditionally state functions.

79.   Defendant CMS was under contract with Arkansas' Department of Correction, an entity of the State of Arkansas, to provide medical services at its state correctional facilities, including the McPherson Unit.

80.   Upon information and belief, plaintiff alleges that Defendant CMS hired Dr. Bardell as the Medical Director for the McPherson Unit, knowing that he was incompetent, had previously deliberately violated the constitutional rights of prisoners, and had been convicted of a crime of moral turpitude.

81.   Pleading in the alternative, if CMS did not know of Dr. Bardell's incompetence and criminal background it certainly should have.

82.   Given Dr. Bardell's level of incompetence and his attitude toward prisoners, it was foreseeable that there would be violations of McPherson Unit inmates' civil rights.

83.   CMS had reason to believe that hiring Dr. Bardell would create an unreasonable risk of harm to McPherson Unit inmates.

18

84. CMS knowingly hired individuals who did not possess the requisite training and experience to properly operate and administer the medical unit at McPherson and respond appropriately to medical emergencies.

85. Defendant CMS failed to properly train and supervise the individuals CMS hired to operate and manage the medical unit and respond to medical emergencies.

86. CMS knew, or had reason to know, that its employees would fail to adequately operate and administer the medical unit and respond appropriately to medical emergencies, violating inmates' Eighth Amendment rights.

87. CMS was deliberately indifferent to the obvious serious medical needs of Ms. Morris, knowing that potentially fatal consequences could be suffered by Ms. Morris by failing to properly hire, train and supervise its employees. CMS failed to properly train and supervise its employees.

88. CMS's policies and customs of failing to properly train and supervise healthcare employees were the moving forces and proximate cause of the violation of Ms. Morris' Eighth Amendment rights.

89. The acts or omissions of CMS caused Ms. Morris damages in that she suffered extreme physical and mental pain during the two months leading up to her death and especially during her final days at the McPherson Unit.

90. The actions of CMS as described herein intentionally deprived Ms. Morris of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

19

## COUNT THREE
(State Law Claim for Medical Negligence)
(Against defendants Bardell, CMS, and Pigg)

91.     Paragraphs 1 through 90 of this Complaint are incorporated by reference as if fully set forth herein.

92.     Defendants Bardell, CMS, and Pigg had a duty to provide reasonable medical care and treatment to inmates at the McPherson Unit, including Virginia Morris.

93.     Defendants Bardell, CMS, and Pigg breached their duty of care and were negligent when they failed to provide Ms. Morris with reasonably obtainable and necessary medication and emergency medical treatment.

94.     Defendants Bardell and Pigg were at all times relevant to this lawsuit employees of CMS and said employees acted on their own behalf and on behalf of CMS when they committed the acts giving rise to the claims against them contained in this Complaint.

95.     CMS is legally responsible to plaintiff for any harm caused by employees acting on its behalf.

96.     CMS, through its agents and employees, failed to exercise reasonable and ordinary care, skill, and diligence, and departed from the generally accepted and recognized standard of care and skill of the medical community in the care and treatment of Ms. Morris. CMS is responsible for the actions of its employees through the doctrine of respondeat superior.

97.     The negligence, carelessness and/or recklessness of Defendants Bardell, Pigg, and CMS consisted of, but is not limited to, the following:

(a)  Failing to properly evaluate and monitor Virginia Morris;

(b)  Failing to timely and frequently review Virginia Morris' status, including her

20

blood sugar levels, blood pressure, respiratory rate, pulse, oxygen level, and medications;

(c)   Failing to recognize and appropriately respond to Virginia Morris' distress;

(d)   Failing to respond to Ms. Morris' pleas for help and medical treatment;

(e)   Failure to administer and/or prescribe appropriate medications;

(f)   Improperly and purposefully delaying treatment to Virginia Morris;

(g)   Failing to provide prompt and appropriate medical care and treatment to

Virginia Morris under the circumstances then and there existing;

(h)   Failing to exercise the degree of care necessary for the appropriate diagnosis

and treatment of Virginia Morris in light of the circumstances then and there existing.

(i)   Failing to possess and/or exercise the appropriate level of knowledge and skill

to accurately interpret Virginia Morris' vital signs, including her blood sugar level, respiratory

rate, oxygen levels, blood pressure, and heart rate.

(j)   Failing to possess and/or exercise the degree of knowledge necessary for the

care, monitoring and/or treatment of an ileus;

(k)   Violating various written and unwritten policies, procedures and guideline of

CMS and the Arkansas Department of Correction;

(l)   Failing to consult with and/or timely consult with knowledgeable medical

specialists regarding the care and treatment of Virginia Morris;

(m)   Failing to obtain appropriate radiographic studies to determine the cause of

Ms. Morris intestinal problems;

(n)   Failing to timely recognize Virginia Morris' distress and ignoring her

repeated cries for help;

21

(o) Failing to recognize and appreciate the significance of and/or respond to Virginia Morris' diabetes, ileus and infections;

(p) Falsely, recklessly and callously accusing Virginia Morris of faking her symptoms despite overwhelming medical evidence of serious life-threatening conditions; and

(q) Remaining consciously indifferent to the rights and safety of Virginia Morris.

98.     By improperly diagnosing Virginia Morris' condition and failing to properly evaluate her symptoms, Dr. Bardell acted negligently and did not use ordinary skill and diligence, nor did he apply the means and methods ordinarily and generally used by physicians of ordinary skill and learning to determine the nature of Virginia Morris' ailment.

99.  By improperly diagnosing Virginia Morris' condition and failing to properly evaluate her symptoms, the CMS nurses at McPherson acted negligently and did not use ordinary skill and diligence, nor did they apply the means and methods ordinarily and generally used by nurses in the medical community of ordinary skill and learning to determine the nature of Ms. Morris' ailment.

100.     Although Plaintiff will file medical care provider affidavits pursuant to Act 649, he asserts that the pleading requirements of Ark. Code Ann. §16-114-209 are unconstitutional. The Arkansas Rules of Civil Procedure govern the procedures for civil proceedings and the only requirements regarding the content of a complaint to be filed in a civil action, such as a medical malpractice action, are set out in Ark.R.Civ.P. 8. Moreover, Rule 11 governs actions filed without a good faith basis in law or fact for doing so. In addition, Ark. Code Ann. §16-114-209 is in conflict with Article II, § 13 of the Arkansas Constitution, which guarantees the right to receive a remedy for injuries or wrongs received.

22

**COUNT FOUR**
(State Law Claim for Negligence)
(Against Defendant CMS)

101.    Paragraphs 1 through 100 of this Complaint are incorporated by reference as if fully set forth herein.

102.    CMS holds itself out as the nation's premier provider of healthcare services to prisons and jails and contracted with the State of Arkansas to provide healthcare services to inmates at all Arkansas correctional facilities, including the McPherson Unit. CMS, acting through its agents and employees, who were then and there acting within the scope of their employment, undertook to render medical care and assistance to Virginia Morris. It became, and was, the duty of the defendants to exercise reasonable care to see that Ms. Morris received proper medical care and attention.

103.    CMS had a duty to establish appropriate policies, protocols, and procedures for its employees who worked within the Arkansas Department of Correction, including the McPherson Unit. Upon information and belief it is alleged that CMS's policies and protocols were inadequate to safeguard patients such as Virginia Morris, and that therefore CMS breached its duty of care toward Ms. Morris.

104.    Defendant CMS had a duty to exercise reasonable care in the hiring, training, and supervision of its employees in a manner that provided the inmates under CMS's care at McPherson with reasonable medical care and treatment.

105.    As set forth above, CMS breached its duty of exercising reasonable care in hiring medical personnel by hiring Dr. Craig Bardell as medical director of the McPherson Unit. CMS

23

either knew or should have known of Dr. Bardell's disastrous record and reputation while medical director of the State Correctional Institute at Muncy, Pennsylvania. CMS knew or should have known that Dr. Bardell had previously caused serious injury and death to female inmates because of his negligence and/or intentional acts.

106.    CMS knew of and had a duty to reasonably investigate the death of Erin Finley, a 26 year old female inmate under the care of Dr. Bardell. As alleged in a lawsuit filed by her mother, Christine Thomas, in the United States District Court for the Middle District of Pennsylvania (Case No. 03-CV-0980), Ms. Finley was a life-long asthmatic who relied on oral steroids and hand-held inhalers. At the time she began her two to four year sentence at SCI Muncy, Ms. Finley was considered a steroid dependant asthmatic and was taking Proventil MDI, Azmacort NZI and Prednizone 10 mg twice a day.

107.    Dr. Bardell, without even examining Ms. Finley, determined that she was abusing steroids and ordered that Ms. Finley's use of steroids be discontinued. This was on July 15, 2002. Over the course of the next month and a half Ms. Finley received treatment or lack of treatment, similar to the above described treatment received by Virginia Morris.

108.    She suffered asthma attacks and severe shortness of breath, and was even hospitalized at one point and prescribed medications for pneumonia, sinusitis and asthma, including Prednisone, Albuteral and a three week course of antibiotics. Dr. Bardell again discontinued the use of any kind of steroids by Erin Finley, and by August 29, 2002, as a direct and proximate result of Dr. Bardell's incompetence and deliberate indifference towards her physical well-being, Erin Finley was dead. Hours before her death she had collapsed and been

24

admitted to the infirmary crying and complaining that she could not breath.  Dr. Bardell was informed of her condition, refused to see her, and walked out of the facility.

109.    These allegations were public record prior to the time CMS hired Dr. Bardell as medical director at the McPherson Unit.

110.    CMS also knew that Dr. Bardell had lost his license to practice medicine in Pennsylvania and plead guilty to a federal charge of Medicare fraud.

111.    CMS also had a duty to adequately train and supervise all CMS medical personnel employed at the McPherson Unit.  Upon information and belief, and based on the above stated facts, it is alleged that the medical staff at the McPherson Unit was inadequately trained and poorly supervised.

112.    CMS knew or should have known that the employees it hired, including Bardell and Pigg, lacked adequate training and experience to provide McPherson inmates with reasonable medical care and treatment.

113.    The misdiagnosis of Ms. Morris' condition, refusal to treat, failure to treat, and improper treatment of Virginia Morris during her incarceration at McPherson, was the proximate cause of her death.

114.    The negligence, carelessness and/or recklessness of Defendant CMS consisted of, but was not limited to, the following:

(a)    Failing to hire and retain only competent and knowledgeable medical staff and ensure that only competent and knowledgeable medical staff were assigned to accepted positions providing medical care to inmates at the state correctional facilities throughout Arkansas.

25

(b)  Failing to ensure that only qualified and sufficiently experienced medical personnel were assigned to Virginia Morris;

(c)  Failing to hire and retain only competent medical personnel;

(d)  Failing to provide appropriate training for its medical personnel;

(e)  Failing to appropriately supervise its medical personnel as to patient care;

(f)  Failing to ensure that its medical personnel possessed reasonable knowledge and skill in the treatment of infectious diseases;

(g)  Failing to ensure that its employees, agents and medical personnel were familiar with and abided by its written and unwritten policies, procedures and protocols;

(h)  Failing to ensure that its employees, agents and medical personnel were familiar with and abided by the State of Arkansas Department of Correction's written and unwritten policies, procedures and protocols;

(i)  Failing to ensure that its employees, agents and medical personnel were able to recognize and appropriately respond to the signs and symptoms of staph infection, diabetes and an ileus;

(j)  Failing to adopt and/or enforce appropriate policies and procedures regarding the care and treatment of staph infection, despite the fact that there was an epidemic of staph at the McPerson Unit;

(k)  Failing to audit or keep appropriate records and/or to track whether skin infections at McPherson are staph related;

(l)  Failing to adopt and/or enforce appropriate policies and procedures regarding the diagnosis, care and treatment of diabetes;

26

(m) Failing to adopt and/or enforce appropriate policies and procedures regarding the diagnosis, care and treatment of infected wounds;

(n)  Failing to adopt and/or enforce appropriate policies and procedures regarding the provision of emergency medical care;

(o)  Discouraging hospitalization of inmates, the referrals of inmates to specialists and the ordering and utilization of necessary and appropriate medical care, tests, services and/or medications for economic reasons.

115.   Virginia Morris' death was the direct and proximate result of the joint and several acts of negligence as set forth above.

## Damages

116.  As a direct and proximate result of the negligent acts of the defendants, Virginia Morris suffered injuries which caused her death.

117.  The Plaintiff, individually and as personal representative of the estate of Virginia Morris, deceased, is entitled to recover for the following damages, all of which were proximately caused by the above-described conduct of the Defendants:

a.      Pecuniary injuries suffered by him because of loss of contribution and support; loss of household services; loss of consortium (the society, services, companionship, and marriage relationship); and mental anguish.

b.      Pecuniary injuries suffered by Virginia Morris' son, Larry Morris, Jr., for mental anguish;

c.      Pecuniary injuries suffered by Virginia Morris' son, Gerome Hill, for mental anguish;

27

d.   Pecuniary injuries suffered by Virginia Morris' siblings, Vera Green, Vanessa Thomas, Clenton Hill, Larry Hill, Joseph Hill, William Hill, and James Hill, according to proof, for mental anguish;

e.   Conscious pain and suffering experienced by Virginia Morris during the time she was under the care of CMS employees at the McPherson Unit and afterwards, prior to her death.

f.   Punitive damages;

g.   Funeral expenses.

h.   Loss of life suffered by Virginia Morris.

## **Jury trial**

118.   Plaintiff requests trial by jury.

WHEREFORE, the Plaintiff, individually and as personal representative of the estate of Virginia Morris, prays for judgment against Defendants in an amount which will sufficiently compensate Virginia Morris' estate her for her injuries and loss of life in excess of $75,000.00, for punitive damages, costs, and all other just and proper relief.

Respectfully submitted,

Law Offices of Peter A. Miller
1601 South Broadway
Little Rock, AR 72206
(501) 374-6300

John M. Hardy
jhardy@aristotle.net
State Bar No. 98003
Attorney for Plaintiff Larry Morris, Sr.